**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

DIANA BENVIDEZ GALINDO,

       Plaintiff,

v.                                            CV 13-0460 WPL

SOCIAL SECURITY ADMINISTRATION
CAROLYN W. COLVIN, Acting Commissioner
of SSA,

       Defendant.

**MEMORANDUM OPINION AND ORDER**

Diana Benvidez Galindo filed an application for Supplemental Security Income ("SSI") payments on February 20, 2009. (Administrative Record ("AR") 12, 157.) She alleged that she had been disabled from December 22, 2008, due to alcohol abuse, diabetes, hypertension, bipolar disorder, depression, and anxiety. (AR 157, 161.) Administrative Law Judge ("ALJ") Barry O'Melinn held a hearing on Galindo's application on January 17, 2012. (AR 28.) He denied Galindo's application, determining that she was not under a disability as defined by the Social Security Act and therefore not entitled to benefits. (AR 22.) Galindo requested review by the Appeals Council, but that request was denied, making the ALJ's decision the final decision of the Social Security Administration ("SSA"). (AR 5-7.)

Galindo sought a review of the SSA's decision (Doc. 1) and filed a motion to reverse and remand for rehearing (Doc. 22). The Acting Commissioner of the SSA ("Commissioner") responded (Doc. 23), and Galindo filed a reply (Doc. 24). After having read and carefully

considered the entire record and the relevant law, I grant Galindo's motion and remand this case to the SSA for proceedings consistent with this opinion.

## STANDARD OF REVIEW

In reviewing the ALJ's decision, I must determine whether it is supported by substantial evidence in the record and whether the correct legal standards were applied. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)). A decision is not based on substantial evidence if other evidence in the record overwhelms it or if there is only a scintilla of evidence supporting it. *Hamlin*, 365 F.3d at 1214 (quotation omitted). However, substantial evidence does not require a preponderance of evidence. *U.S. Cellular Tel. of Greater Tulsa, L.L.C. v. City of Broken Arrow, Okla.*, 340 F.3d 1122, 1133 (10th Cir. 2003). I must meticulously examine the record, but I may neither reweigh the evidence nor substitute my discretion for that of the Commissioner. *See Hamlin*, 365 F.3d at 1214 (quotation omitted). I may reverse and remand if the ALJ has failed "to apply the correct legal standards, or to show us that []he has done so." *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## SEQUENTIAL EVALUATION PROCESS

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); *Wall*, 561 F.3d at 1051-52; 20 C.F.R. § 416.920 (2014). If a finding of disability or nondisability is directed at any point, the SSA will not proceed through the remaining steps. *Thomas*, 540 U.S. at 24. At the first three steps, the ALJ considers the claimant's current work activity and the severity of her impairment or

combination of impairments. *See id.* at 24-25. If no finding is directed after the third step, the Commissioner must determine the claimant's residual functional capacity ("RFC"), or the most that she is able to do despite her limitations. *See* 20 C.F.R. §§ 416.920(e), 416.945(a)(1). At step four, the claimant must prove that, based on her RFC, she is unable to perform the work she has done in the past. *See Thomas*, 540 U.S. at 25. At the final step, the burden shifts to the Commissioner to determine whether, considering the claimant's vocational factors, she is capable of performing other jobs existing in significant numbers in the national economy. *See id.*; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail).

## FACTUAL BACKGROUND

Galindo, age forty-nine, finished her formal education after the eighth grade and has worked primarily as a caregiver and motel housekeeper for the past two decades. (AR 46, 162, 166.) It does not appear that Galindo has held a full-time position for the last sixteen years. (*See* AR 33, 162.) Her potential disability onset date was December 22, 2008, which is the day that she was terminated from her most recent housekeeping position. (*See* AR 157, 161.)

Although Galindo alleged—and was found by the ALJ to suffer from—several physical impairments, her claims of error primarily revolve around her mental RFC. Accordingly, my discussion of the medical evidence in the record will largely focus on the records relevant to Galindo's mental impairments.

In late 2006, Galindo was referred to Raymundo A. Molina for a behavioral health evaluation. (AR 1295.) Galindo reported long-term anxiety, fatigue, disorganized thoughts, concentration problems, forgetfulness, depression, and avoidance of social situations. Dr. Molina's cognitive testing revealed average intellectual ability and very limited word knowledge

and comprehension. (AR 1295-98.) A multiaxial inventory assessed "cognitive slipping," anxiety reactions, and "brief reactive psychoses" in demanding social situations. (AR 1298.) Galindo's mood was observed as depressed, restless, and anxious, with constricted affect and poor concentration. (AR 1298-99.) Dr. Molina assessed Galindo with posttraumatic stress disorder (PTSD), alcohol dependence, schizoid personality, features of dependent personality and a GAF score of 50.[1] (AR 1299-1300.) No further record of treatment by Dr. Molina was provided.

Galindo lost her job as a motel housekeeper on December 22, 2008 (AR 161), and she began receiving unemployment benefits shortly thereafter (*see* AR 1147). Galindo applied for SSI payments in February 2009. (AR 135.)[2] In the accompanying disability report, Galindo alleged anxiety and problems being around people, and she admitted that she lost her job due to an arrest for driving while intoxicated ("DWI"). (AR 161.) In a function report completed the following month, Galindo stated that her psychological ailments sometimes leave her confused or make her lose concentration, often causing her to forget what she is doing. (AR 170, 172-73.) She estimated that she can pay attention for one or two minutes at a time, and she said that she does not finish tasks that she starts, does not follow written instructions well, and often has to start over repeatedly when given spoken instructions. (AR 175.) She claimed that she was fired from a job as a busperson in 2007 due to her failure to follow instructions or complete tasks, and

---

[1] The GAF is "a hypothetical continuum of mental health-illness" assessed through consideration of psychological, social, and occupational functioning. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed., text rev. 2005). A score between forty-one and fifty is assessed when the patient is believed to have "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning." *Id.* Although the fifth edition of the *DSM* dropped the GAF rating in 2013 in favor of an alternative assessment schedule, all of Galindo's relevant mental health providers used this scoring method.

[2] Although Galindo also applied for disability insurance benefits (*see* AR 131-34), only the denial of her SSI application is at issue here (*see* AR 12).

4

she noted that her anxiety and bipolar conditions leave her feeling scared and otherwise "awful." (AR 176.)

Galindo began treatment with Southwest Counseling Center ("SWC") in February 2009 following a referral from the state Division of Vocational Rehabilitation. (AR 1146.) In a Comprehensive Intake Assessment completed by Licensed Master Social Worker Albert Jacquez, Galindo admitted that she had an "extreme problem" with alcoholism and that she had recently been arrested for her second DWI. (AR 1147.) She also admitted that she had a "considerable" crack cocaine problem but claimed that she had not used that substance for ten months. (*Id.*) She complained of panic attacks, alcohol-induced hallucinations, restless sleep, and a "death wish," and she said that Dr. Molina had diagnosed her with bipolar disorder. (*Id.*) On examination, Jacquez found Galindo to be restless with excessive speech, labile affect, impaired recent memory, and limited insight and judgment. (AR 1148.) He also observed that she was cooperative and focused, with elevated mood, intact orientation and concentration, and no suicidal or homicidal ideation. (*Id.*) Jacquez assessed Galindo with alcohol dependence and bipolar and anxiety disorders, and he assigned a GAF score of 49. (AR 1157, 1159.)

SWC personnel prescribed medication to treat anxiety and depression several days later. (AR 1170.) At that session, Vickie Alvarez, CNS, found that Galindo was well-groomed and cooperative, possessing appropriate affect, euthymic mood, focused thought processes, intact orientation and concentration, and no delusions or suicidal or homicidal ideation. (*Id.*) She also found that Galindo was restless, her speech was excessive, her recent memory was impaired, and her insight and judgment were limited. (*Id.*) Like Jacquez, Alvarez assessed a GAF score of 49. (AR 1173.)

In April 2009, Galindo underwent a consultative psychological evaluation by David Holcomb, Ph.D. (AR 611.) Galindo provided Dr. Holcomb with a 2005 letter from an outpatient counselor diagnosing her with PTSD, bipolar disorder, and an unspecified anxiety disorder. (*Id.*) She told Dr. Holcomb that she had experienced depression, anxiety, panic attacks, fatigue, and extensive agoraphobia for a long time. (AR 612-14.) She also said that she had been alcohol-free for two months, and she denied having ever used any other illicit substances in the past. (AR 613.) She reported that she had lost her most recent job as a housekeeper due to pain in her arms and legs, irritability with coworkers and supervisors, and difficulty staying focused. (AR 614.)

In his examination, Dr. Holcomb observed that Galindo seemed to be friendly and oriented to her surroundings, was engaged throughout the process, and did not appear fatigued. (*Id.*) He did notice a "mildly troubled affect and apparent mildly depressed mood," apparent anxiety and tension, poor articulation, and mildly impaired concentration. (AR 614-15.) However, although Galindo was "mildly circumstantial" in speech, she responded well to redirection, remained generally focused, and followed directions well. (*Id.*) Her thoughts were logical and task-oriented, her memory was generally unimpaired, and there was no evidence of a thought disorder. (AR 615.)

Following his review, Dr. Holcomb noted no overt cognitive deficits or impulsivity and an apparent ability to understand and follow directions. (AR 616.) That said, he found that Galindo's descriptions of her psychological functioning supported diagnoses of PTSD, alcohol dependency, and mood and anxiety disorders. (AR 615.) He further observed that Galindo's sophistication was limited, her concentration and task resilience appeared "impaired," and her approach to tasks suggested potential problems in a work environment. (AR 616.) Dr. Holcomb also noted that Galindo's descriptions suggested "a high potential for interpersonal problems in

work settings, and a marked risk for inconsistency in withstanding normal external pressures associated with conventional employment." (*Id.*) He concluded that Galindo "experiences a subjectively difficult and limiting combination of . . . psychiatric symptoms," and he assigned a GAF score of 50. (*Id.*)

The following day, non-examining consultative psychologist Donald Gucker, Ph.D., reviewed Dr. Holcomb's report and assessed Galindo with an unspecified bipolar disorder, panic disorder with agoraphobia and PTSD, and alcohol dependence. (AR 617.) He found moderate limitations in understanding and remembering detailed instructions but otherwise assessed no significant limitations in understanding and memory. (AR 631.) He also found moderate limitations in carrying out detailed instructions, maintaining attention and concentration for extended periods, sustaining routine without supervision, maintaining punctuality and attendance, and completing a normal workday without interruption from symptoms. (AR 631-32.) Otherwise, though, he found no significant concentration or persistence impairments, he stated that Galindo could handle simple instructions and decisions well, and he concluded that she could attend and concentrate for two hours at a time. (AR 631-32, 634.) Dr. Gucker primarily assessed moderate limitations in social interaction, but he found no significant limitation in the ability to ask simple questions and felt that Galindo could interact adequately with coworkers and supervisors. (AR 632, 634.) He found moderate limitations in travel to unfamiliar places and setting realistic goals or plans, but otherwise he saw no significant limitations in adaptation and concluded that Galindo could respond appropriately to changes in a work setting. (*Id.*) The SSA reached an initial determination of nondisability almost two months later. (AR 60-61.)

Meanwhile, Galindo continued treatment with Jacquez for approximately the next two years. (*See* AR 1087, 1092, 1098, 1104, 1109, 1215, 1288, 1302.) An update to her treatment

plan in June 2009 showed that other than some grogginess from sleeping pills, Galindo's medication regimen had improved her feelings of depression and anxiety, and she reported no panic attacks in the previous three months. (AR 1095.) That said, she continued to drink about twice a week, with about eight beers consumed each time. (*Id.*) Two months later, Galindo again reported that her medication was effective and said that she had stopped drinking for about a month, though she continued to experience depression related to her alleged physical impairments. (AR 1094.) In November 2009, Galindo reported to Jacquez that she had been taking her medications off-and-on and had only been sober for the past three weeks, and she appeared more anxious. (*Id.*) She ran out of her medications before a February 2010 visit, and at that time she again appeared anxious and depressed due in part to health problems. (*Id.*)

At a visit on April 8, 2010, Jacquez completed a Solution Focused Assessment for Galindo. (AR 1115-25.) At that time, Galindo appeared to have recent memory impairment and limited judgment. (AR 1115-16.) Still, Jacquez noted that Galindo was well-groomed, cooperative, appropriate in affect and euthymic in mood, with focused thoughts, intact orientation and concentration, good insight, spontaneous speech, and restless but otherwise calm motor activity. (*Id.*) She reported no hallucinations, delusions, or suicidal or homicidal ideation. (*Id.*) Jacquez concluded that Galindo required no assistance with household or food management, communication skills, housing, transportation, health and hygiene, safety, or money management. (AR 1118.) He observed that her boyfriend and friends provided natural support for her, and he noted strength in her ability to maintain relationships, live independently, care for herself and others, manage her finances, and participate in treatment. (AR 1119, 1121.)

Galindo's diagnoses remained largely the same, except that Jacquez now assessed a GAF of 59.[3] (1124-26.)

In June 2010, W. Miller Logan, M.D., another non-examining agency consultant, reconsidered Galindo's SSI application at her request. (AR 1201.) Dr. Logan noted that the only newly available records of mental health treatment since the initial benefits denial was an update to Galindo's treatment plan at SWC from March 2010. (*Id.*) Having reviewed that and the other evidence before him, Dr. Logan affirmed the SSA's denial of benefits. (AR 62-63, 1201.)

Galindo's outpatient treatment with Jacquez continued into 2011. (AR 1218, 1290.) In July 2010, Galindo said that she had decided to stop drinking three weeks earlier, but she had run out of her medications, and she reported some depression and anxiety. (AR 1218.) Jacquez found her to be anxious and moderately hyper with appropriate speech and orientation. (*Id.*) Three months later, Galindo again said that she wanted to "keep working at not drinking," and she said that she felt anxious and "a little depressed." (AR 1290.) Although Jacquez concluded that Galindo was "moderately hyper," he found that she had appropriate speech, orientation, affect, and psychomotor activity. (*Id.*)

On December 6, 2010, Jacquez completed a form describing his opinions regarding Galindo's ability to complete work-related activities on a daily basis in a regular work setting. (AR 1315.) The form directed Jacquez to base his opinions on his examination of Galindo. (*Id.*) Jacquez reported that Galindo was seeing him once a month, he included diagnoses of bipolar disorder and anxiety disorder, and he listed Galindo's current GAF score as 49 and her highest for the past year at 47. (*Id.*) After reviewing her symptoms, Jacquez stated that Galindo was

---

[3] A GAF score of fifty-one to sixty is assessed when the patient is believed to have "[m]oderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning." Am. Psychiatric Ass'n 34.

unable to meet competitive standards for accepting supervisors' instructions, responding appropriately to supervisors' criticism, or responding appropriately to changes in a routine work setting. (AR 1315-16.) He also said that Galindo was seriously limited, but not precluded, in her ability to understand and remember simple instructions, to maintain attention and ability to concentrate on such instructions for two-hour segments, to perform at a consistent pace without distraction, to deal with normal work stress, and to maintain socially acceptable behavior. (AR 1316.) Otherwise, he stated that Galindo had a limited but satisfactory ability to carry out simple instructions, and he found no limitations in any other respects. (*Id.*)

In a January 2011 case formulation update, Jacquez found Galindo to be moderately hyper, and he noted that Galindo claimed to still feel anxiety and moderate depression. (AR 1305.) Despite her anxiety, Galindo was preparing to get her driver's license again, she claimed to maintain sobriety, and her affect, psychomotor activity, speech, and orientation were appropriate. (*Id.*)

## HEARING TESTIMONY

On March 20, 2012, the ALJ held a videoconference hearing at which both Galindo and a vocational expert ("VE") testified. (AR 28.) Galindo was represented by an attorney, who claimed that her primary limitations were non-exertional. (AR 28, 32.) Galindo testified that she was fired from her most recent job in 2008 for failure to call or show up on time, "because I have trouble for transportation, and I was late." (AR 36.) When asked by the ALJ to clarify this statement, Galindo said that she does not drive because she does not concentrate well. (*Id.*) When the ALJ pointed out that Galindo had stated on other occasions that she lost her job because of her 2008 DWI arrest, Galindo conceded the point and noted that her truck had been impounded. (AR 36-37.) When the ALJ asked why Galindo omitted this arrest in her response, Galindo

10

replied, "I probably forgot about it." (AR 37.) Later in the hearing, on her attorney's questioning, Galindo stated that she had not meant to be dishonest in that answer and that she tends to forget things. (AR 46-47.)

Galindo also testified that she collected unemployment benefits after losing her job in 2008, but she stated that she never had any job interviews during that time. (AR 41.) When the ALJ noted that applications for unemployment benefits require the applicant to affirm that she is ready and able to work, Galindo said that she only looked for work because otherwise her benefits would have been canceled. (AR 41-42.)

As to her impairments, Galindo said that she no longer drinks and that she had her last drink around ninety days earlier. (AR 42-43.) She testified that she has trouble with concentration and anxiety but that her medications help on both fronts. (AR 43.) She testified that she has trouble sleeping and claimed that her medication for that problem is sometimes insufficient, leading to only five or six hours a night of sleep. (AR 49.) She claimed that she had trouble focusing and following instructions while working at her last job, but she said that she had no problems working with her coworkers. (AR 50-51.) Galindo testified to experiencing anxiety and moderate depression three or four times a week, though she noted that her monthly counseling sessions and medication were helping. (AR 52-53.)

Next, the VE testified regarding Galindo's past work history and future work ability. Having reviewed Galindo's past work, the ALJ first asked the VE if, hypothetically speaking, Galindo would be able to perform work if she were limited to understanding, remembering, and carrying out simple instructions; making simple decisions; attending and concentrating for two hours at a time; interacting appropriately with coworkers and supervisors; responding appropriately to changes in a routine work setting; and various exertional limitations. (AR 56-

11

57.) The VE testified that Galindo would be able to perform past relevant work in housekeeping and would be able to perform other work as a photograph finisher, a cafeteria attendant, or a cashier. (AR 57-58.)

### THE ALJ'S AND APPEALS COUNCIL'S DECISIONS

The ALJ reviewed Galindo's claim pursuant to the five-step sequential evaluation process. (AR 12-13.) He first determined that Galindo had not engaged in substantial gainful activity since she submitted her SSI benefits application on February 20, 2009. (AR 14.) He then found at step two that Galindo suffered from the severe impairments of bipolar disorder and an anxiety disorder with panic attacks, along with several physical impairments. (*Id.*) At step three, the ALJ concluded that Galindo did not meet or medically equal an impairment listed in Appendix 1 of the SSA's regulations. (AR 14-15; *see also* 20 C.F.R. Part 404, subpt. P, app'x 1.)

At the beginning of step four, the ALJ concluded that Galindo possessed an RFC to perform light work subject to certain physical limitations and the following mental limitations: understanding, remembering, and carrying out only simple instructions; making simple decisions; attending and concentrating for two hours at a time; interacting adequately with coworkers and supervisors; and responding appropriately to changes in a routine work setting. (AR 16.) In doing so, the ALJ cited to Galindo's hearing testimony, her function report, notes from treating physicians, and records from Jacquez, Alvarez, Dr. Holcomb, and Dr. Gucker.

In a boilerplate statement, the ALJ concluded that Galindo's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with [her] [RFC]." (AR 16.) Elaborating, he noted that at the hearing Galindo had blamed her job loss on failure to show up to work on time, only admitting to her DWI conviction when the ALJ pointed it out. (*Id.*) Although Galindo blamed her initial statements on

12

memory loss, the ALJ pointed out that Galindo remembered being fired without prompting, that an arrest and its consequences would likely be at least as memorable, and that Galindo had accurately recalled the arrest when speaking with Dr. Holcomb and others. (*Id.*) Further, the ALJ noted that Galindo collected unemployment during the period under consideration and that such benefits require the recipient to be willing and able to work. (AR 17.) Finally, the ALJ observed that Galindo had secured transportation to attend many medical appointments but had missed others, thereby questioning whether Galindo's symptoms could be as severe as claimed since she was apparently not motivated to seek appropriate treatment. (*See* AR 20-21.)

The ALJ reviewed reports from Jacquez and Dr. Holcomb in some detail. (AR 18-20.) Though the ALJ discussed Jacquez's opinions from December 6, 2010, regarding Galindo's ability to work, he concluded that Jacquez's opinions were inconsistent with his own treatment notes and the record as a whole. (AR 19, 20.) The ALJ pointed to notes ranging from the beginning of Galindo's treatment through January 2011, specifically highlighting the April 8, 2010 GAF rating of 59 and implicitly contrasting it with Jacquez's statement that Galindo's highest GAF in 2010 was 47. (*See* AR 19.) Given these inconsistencies, the ALJ concluded that Jacquez's opinion was not entitled to any significant weight. (AR 19, 20.) The ALJ also generally discounted Dr. Holcomb's conclusions, noting that many of his opinions were based on Galindo's unreliable assertions. (AR 20.)

Relying on the assigned RFC, the ALJ opined that Galindo had little reason to stop working in 2008 other than her arrest and incarceration in 2008, and he believed that Galindo could return to work within the RFC parameters now that her alcoholism was apparently under control. (*Id.*) That said, he stated that the VE had testified that Galindo was unable to perform

past relevant work,[4] and therefore he moved to step five. (*Id.*) Concluding from the VE's testimony that Galindo could perform jobs that exist in significant numbers in the national economy, the ALJ determined that Galindo was not disabled under the meaning of the Social Security Act and not entitled to benefits. (AR 20-22.) Although Galindo appealed this decision, the Appeals Council found no reason to review it, thus rendering the ALJ's decision the final decision of the Commissioner. (AR 5-7.)

DISCUSSION

Galindo alleges three broad categories of error in the ALJ's decision (*see* Doc. 22 at 3-4), which I reorganize in logical fashion. First, Galindo argues that the ALJ erred in discounting her credibility. Second, she contends that the ALJ improperly evaluated evidence from three sources. Finally, she asserts that the ALJ erred in developing the RFC that was based on the evidence from Galindo and her medical sources. Because I find that the ALJ erred in her treatment of certain source evidence, I do not reach the third claim of error.

## I.     Credibility

"Credibility determinations are peculiarly the province of the finder of fact, and [courts] will not upset such determinations when supported by substantial evidence." *Diaz v. Sec'y of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990). "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988). So long as this is the case, courts generally defer to the ALJ on matters of credibility. *See, e.g.*, *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).

---

[4] This statement appears to be inconsistent with the testimony of the VE, who stated that Galindo could work as a housekeeper given the ALJ's hypothetical RFC that was ultimately adopted. (*Cf.* AR 56-58.) However, neither party challenges this particular step-four determination.

Galindo first challenges the boilerplate nature of the ALJ's credibility determination. Although the Tenth Circuit discourages the use of boilerplate language, *see, e.g.*, *Briggs ex rel. Briggs v. Massanari*, 248 F.3d 1235, 1239 (10th Cir. 2001), the key question is whether such language is supported by a more thorough analysis that clearly considers the evidence in the record, *see, e.g.*, *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1169-70 (10th Cir. 2012); *Hardman v. Barnhart*, 362 F.3d 676, 679-80 (10th Cir. 2004). Because the ALJ spent several paragraphs discussing Galindo's testimony and her statements to various examiners and linking these statements to his credibility determination, his use of boilerplate language to describe this determination is not itself error. *See Hardman*, 362 F.3d 679-80; *see also Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000) (holding that an ALJ's credibility determination is adequate "[s]o long as [he] sets forth the specific evidence he relies on in evaluating the claimant's credibility").

Next, Galindo criticizes the ALJ for basing a negative credibility determination in part on her hearing testimony regarding the reasons for losing her job in 2008, where she failed to mention her DWI arrest and instead blamed other "trouble for transportation." In doing so, Galindo cites to her testimony that she suffers from memory problems and that she was not trying to be dishonest. Yet, the ALJ specifically considered and rejected these statements, concluding that it was unlikely Galindo would fail to accurately remember her DWI arrest since she remembered it when speaking to some examining sources and she remembered other details about losing her job. (*See* AR 16.) Additionally, although there was some independent evidence in the record of short-term memory impairment (*see, e.g.*, AR 1148), none of her providers diagnosed Galindo with remote memory impairment (*see, e.g.*, *id.*). Accordingly, the ALJ was not required to defer to Galindo's self-serving statements regarding long-term memory loss. *See*

*Owings v. Chater*, 62 F.3d 1429, 1995 WL 478158, at *2 (10th Cir. 1995) (unpublished table decision). Finally, whether Galindo's inconsistent statements may be attributable to dishonesty or mere forgetfulness, I see no error in the ALJ finding the statements to be incredible, for the testimony would be unreliable in either case.

Galindo also argues that the ALJ erred in considering her pursuit of unemployment benefits during her period of alleged disability in reaching his credibility determination. The ALJ correctly noted the "general rule" that the receipt of unemployment benefits in New Mexico hinges on the recipient's willingness and ability to work. *See* N.M. STAT. ANN. § 51-1-5(A)(3). Although Galindo is correct that this fact is not by itself conclusive as to credibility, *see, e.g.*, *Alverio v. Chater*, 902 F. Supp. 909, 928 (N.D. Iowa 1995), the ALJ did not err simply by considering the matter as one element of substantial evidence supporting his credibility determination, *see, e.g.*, *Hund v. Astrue*, No. 12-cv-01985-LTB, 2013 WL 5729960, at *12 (D. Colo. Oct. 21, 2013) (unpublished) (citations omitted).

Moreover, in addition to these factors, other substantial evidence in the record supports the ALJ's credibility determination. First, when Dr. Holcomb asked Galindo why she lost her job in December 2008, she cited pain in her extremities and problems focusing and working with others, making no mention of either her DWI arrest or other "trouble [with] transportation." (*See* AR 614.) This demonstrates that Galindo's hearing testimony was not the first time that she had, purposefully or not, failed to accurately describe the cause of her job loss, thereby demonstrating a pattern of unreliability on that question. Second, the ALJ found that Galindo's allegations regarding the severity of her symptoms were not credible given her decision to secure transportation to some but not all of her treatment appointments (AR 19-20), and Galindo does not challenge the ALJ's consideration of this factor. Third, although Galindo admitted to Jacquez

16

that she previously suffered from a "considerable" crack cocaine problem (*see* AR 1147), she told Dr. Holcomb that she had never used any illicit substances other than alcohol (*see* AR 613). Considering that Galindo initially sought benefits in part on the basis of a substance abuse problem (*see* AR 161), her decision to not be entirely forthcoming with her examining sources regarding her use of illicit substances is material and adds further substantial evidence to the ALJ's credibility determination.

Finally, Galindo contends that other evidence refutes the ALJ's credibility finding, including the fact that Dr. Holcomb concluded that she was not exaggerating her problems and the fact that she has received medication for her psychological problems. Since substantial evidence supports the ALJ's credibility determination, *see Diaz*, 898 F.2d at 777, I will not accept Galindo's invitation to reweigh the evidence and to impermissibly substitute my own judgment for that of the ALJ, *see Hamlin*, 365 F.3d at 1214 (quotation omitted).

## II.   Source Evidence

### A.   Dr. Paz

At the outset, Galindo claims in a cursory fashion that the ALJ's analysis of evidence from Conchita Paz, M.D., who treated Galindo's alleged physical impairments, was contrary to law and contrary to the evidence. (Doc. 22 at 4.) However, at no point in her briefing does Galindo argue why this is the case. Because Galindo has effectively waived this claim, I find that she has failed to establish that the ALJ erred in his treatment of Dr. Paz's evidence.

### B.   Jacquez

Galindo argues that the ALJ erred by concluding that Jacquez's opinion should not be afforded "any significant weight" and thereafter failing to state the exact weight given to the opinion. Relatedly, Galindo asserts that the ALJ should have assigned greater weight to

Jacquez's opinion than to Dr. Holcomb's findings.[5] The Commissioner responds that Jacquez is not an acceptable medical source and that his opinions are not entitled to the heightened deference given to such sources. Galindo replies that Jacquez's opinions as a therapist are entitled to appropriate consideration, even though he is not an acceptable medical source.

Only evidence from "acceptable medical sources" can establish that a claimant suffers an impairment, *see* 20 C.F.R. § 416.913(a), and only such sources can provide "medical opinions," *see id.* § 416.927(a)(2). Further, only "acceptable medical sources" can be considered "treating sources" whose opinions are entitled to controlling weight. *Id.* §§ 416.902, .927(d). "The regulations, however, also contemplate the use of information from 'other sources,' both medical and non-medical." *Frantz v. Astrue*, 509 F.3d 1299, 1301 (10th Cir. 2007) (citations omitted). In particular, therapists such as Jacquez are considered to be "[m]edical sources" or "other medical sources," and the evidence that they provide may be used to show the severity of a claimant's impairments and how they affect her ability to work. *See id.* (citation omitted); *see also* 20 C.F.R. § 416.902, .913(d). As the agency recognized in Social Security Ruling ("SSR") 06-03p, "Opinions from these medical sources, who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." SSR 06-03p, 2006 WL 2329939, at *3 (Aug. 9, 2006).[6]

As with acceptable medical source opinions, the weight of these other medical source opinions can be crucial to an ALJ's decision. SSR 06-03p instructs the ALJ to "explain the

---

[5] Galindo does not challenge the ALJ's weighting of Dr. Holcomb's findings in and of itself.

[6] SSRs are binding on the SSA, and while they do not have the force of law, courts traditionally defer to SSRs since they constitute the agency's interpretation of its own regulations and foundational statutes. *See Sullivan v. Zebley*, 493 U.S. 521, 531 n.9 (1990); 20 C.F.R. § 402.35; *see also Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993) (SSRs entitled to deference).

weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning." *Id.* at *6. In doing so, the ALJ is to use essentially the same factors that apply to the weighing of acceptable medical source opinions, including (1) the length and frequency of the source and claimant's relationship; (2) the consistency of the source's opinion with other evidence; (3) the supportability of the opinion; (4) how well the source explains the opinion; (5) the source's status as a specialist; and (6) other factors that tend to support or contradict the opinion. *See id.* at *4-5 (citations omitted). Further, "[t]he fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source' because . . . 'acceptable medical sources' 'are the most qualified health care professionals.'" *See id.* at *5 (quotation omitted).

The Tenth Circuit has justified a more relaxed approach to the weighing of "other source" opinions, as opposed to acceptable medical source opinions, by pointing to SSR 06-03p's requirement that an ALJ's decision need only ensure that the reviewing court can "follow the adjudicator's reasoning," *see* 2006 WL 2329939, at *6. In *Keyes-Zachary*, for example, the Tenth Circuit refused to remand when the ALJ failed to explain the weight given to a therapist's GAF ranking that was lower than other GAF evidence in the record. *See* 695 F.3d at 1163-65. The court found no reversible error because "it [wa]s obvious that the ALJ gave little or no weight to [the therapist]'s GAF opinion. Simply put, had he assigned great weight to the low GAF score, he would not have developed the mental RFC for [the claimant] that he did." *See id.* at 1164. This holding was bolstered by the fact that the therapist's GAF ranking was notably lower than one assigned by an acceptable medical source during a consultative examination—

after all, the examiner's status as an acceptable medical source was enough to justify assigning greater weight to his opinion. *See id.* at 1164-65 (citing SSR 06-03p, 2006 WL 2329939, at *5).

Here, it is apparent that the ALJ assigned very little weight to Jacquez's opinion regarding Galindo's ability to meet competitive work standards. Indeed, the ALJ expressly says—twice—that he does not afford Jacquez's opinion "any significant weight." (AR 19; AR 20.) Further, the ALJ spent several pages discussing Jacquez's treatment of Galindo, indicating consideration of the length and frequency of the treatment relationship and Jacquez's status as a specialist. He also contrasts Jacquez's findings against those reached by Dr. Gucker, an acceptable medical source who concluded that Galindo was not disabled. Although the ALJ recites Jacquez's opinion that Galindo is unable or limited in her ability to perform certain tasks, he also pointedly cites to inconsistent findings from Jacquez's own notes, including findings of only moderate problems with anxiety and depression and mild or no symptoms of other problems. Most expressly, he points out that the "highest past year GAF" of 47 in December 2010 is inconsistent with a GAF finding of 59 only eight months earlier.

In short, "it is obvious that the ALJ gave little or no weight" to Jacquez's opinion of Galindo's ability to work, *see Keyes-Zachary*, 695 F.3d at 1164, and I can easily "follow the adjudicator's reasoning" in reaching this conclusion, *see* SSR 06-03p, 2006 WL 2329939, at *6. I therefore find no error in the ALJ's conclusions on this point.

As an epilogue, I conclude that the ALJ did not err in assigning less weight to Jacquez's opinions than to Dr. Holcomb's findings. It is true that "depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source.'" *Id.* at *5. In this case, however, the ALJ appropriately considered the relevant

factors and assigned no significant weight to Jacquez's conclusions. Add to this the fact that Dr. Holcomb is an acceptable medical source, and the ALJ's relative weighting of these sources' opinions is completely justifiable. *See id.*

C. Dr. Holcomb

Next, Galindo argues that the ALJ erroneously described Dr. Holcomb's conclusions regarding her mental impairments. More broadly, however, Galindo asserts that the ALJ erred in discounting Dr. Holcomb's opinions regarding the severity of her mental impairments because these opinions were based on Galindo's own unreliable statements. In doing so, Galindo contends, the ALJ impermissibly sorted through Dr. Holcomb's opinions to "pick and choose" only those conclusions that supported a finding of nondisability.

Psychological opinions may rely on "observed signs and symptoms" as well as on psychological tests. *Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004) (citation omitted). Such opinions are also "necessarily dependent, at least in part, on a patient's subjective statements." *Thomas v. Barnhart*, 147 F. App'x 755, 759 (10th Cir. 2005) (unpublished). Additionally, an ALJ may not outright reject an acceptable medical source's opinions on the basis of "his or her own credibility judgments, speculation, or lay opinion." *See McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) (quotation omitted) (discussing treating physician opinions). Instead, such opinions may only be rejected "on the basis of contradictory medical evidence." *See id.* This is consistent with the principle that an ALJ cannot substitute his own opinions for the medical judgments of an acceptable medical source. *See Thomas*, 147 F. App'x at 759.

I share the ALJ's concerns that Dr. Holcomb's opinions were colored by incredible—or at least inconsistent—statements that Galindo made to him. Indeed, the record demonstrates at

least two verifiable instances where Galindo made statements to Dr. Holcomb that were inconsistent with statements made to other sources—when she stated that she was fired in December 2008 for reasons other than her DWI conviction, and when she said that she had never used illicit substances despite having told Jacquez about her previous crack cocaine addiction. Because Dr. Holcomb's findings were "necessarily dependent, at least in part," on Galindo's inconsistent statements, it is disconcerting to think that Dr. Holcomb reached certain medical conclusions based on those statements.

That said, the ALJ was not permitted to substitute his own judgment for Dr. Holcomb's simply because he found Galindo to not be credible. *See id.* Despite the inconsistencies highlighted above, Dr. Holcomb concluded that Galindo "exhibited no overt behaviors suggesting exaggeration of her current situation or problems." (AR 615.) If the ALJ believed that Dr. Holcomb's opinion or the record as a whole needed further development in light of new or contradictory information, he should have sought additional evaluation from Dr. Holcomb or another consultative examiner. *See* 20 C.F.R. § 416.919a(b); *see also Hawkins v. Chater*, 113 F.3d 1162, 1166-67 (10th Cir. 1997). Alternatively, if he felt that Dr. Holcomb's findings were contradicted by other medical evidence, then he could have appropriately rejected those findings on that basis. *See McGoffin*, 288 F.3d at 1252. However, rejection solely on the basis of Galindo's own credibility problems, as determined by the ALJ, was improper. *See id.* On remand, the ALJ will take appropriate steps to properly evaluate Dr. Holcomb's findings and, if necessary, to resolve any inconsistencies between those findings and the record as a whole.

**CONCLUSION**

The ALJ erred in his review of Galindo's applications for SSI payments. Although he appropriately assessed Galindo's credibility and evidence from her therapist, he failed to apply the correct legal standards in rejecting evidence from consultative examiner Dr. Holcomb. As such, I grant Galindo's motion to reverse, and I remand this case back to the SSA for proceedings consistent with this opinion.

IT IS SO ORDERED.

_____
William P. Lynch
United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.